UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | INDICTMENT NO. 05-10039-NG |
| ) | |
| ARCENIO POCHE-CHACON ) | |
| aka ANDRES DEL ROSARI0 ALAYON ) | |

### DEFENDANT'S MEMORANDUM IN SUPPORT
### OF HIS MOTION TO SUPPRESS EVIDENCE

Arcenio Poche-Chacon (the "Defendant"), in the above-numbered Indictment and through Counsel, having filed a Motion to Suppress certain material seized from him on January 31, 2005, brings the following Memorandum in Support of such Motion. In so doing, he relies upon his protections pursuant to the Fourth, Fifth and Sixth Amendments to the United States Constitution.

**Facts.**

On January 31, 2005, the Defendant travelled aboard American Airlines flight 2084 from Santo Domingo to Logan Airport, Boston.

Evidently, the folks at Customs have created an entity entitled "Passenger Analysis Unit" ("PAU"), and the Defendant was subjected to whatever scrutiny the practices under PAU entail. Whatever trigger drew the attention of Customs Inspectors, the Defendant was referred to "Customs Secondary" for further examination.

Customs and Border Protection ("CBP") Inspectors Fisher, Campfield and Portalatin conducted the "secondary inspection."

The Defendant was a Resident Alien who frequently travelled outside the United States,

and who had purchased his ticket to Boston from a travel agency in the Dominican Republic.[1] He told the Inspectors he had spent about a month in the Dominican Republic to visit a sick nephew. The Defendant listed his address as "Hervoll, MA," and told the Customs people that he lived with his sister-in-law and her husband in Haverhill.

Asked about his airline ticket, the Defendant said it was cheaper to buy a one-way fare from Boston to the Dominican Republic, upon further inquiry, the Defendant told the Inspectors that while in the Dominican Republic he purchased a round-trip ticket from Santo Domingo to Boston and back because it was cheaper than a one-way fare. The Inspectors queried the Defendant on what they perceived as a "discrepancy" in his information, but he did not explain.[2]

Pressing what they must have thought was an advantage, the Inspectors further interrogated the Defendant. He told them that in his home country, he had stayed for a while with his Mother and also for a time with his Grandmother. On the day of his return to Boston, he first visited some other relatives,[3] ate, then went to the airport to make his flight. To this point in the interrogation, the Inspectors had no reason to believe -- or even suspect -- that the Defendant had committed, or was about to commit, any crime. Further, there was no information in the hands of the Inspectors which ought to have even raised a suspicious brow.

His interrogators then observed that the Defendant had a "dry mouth," "lethargy" and a "rigid stance." These phenomena, claimed the Customs people, were *indicia* of an "internal carrier," presumably meaning the carriage of drugs in some anatomical cavity. Such circumstances, of course, might very well be likely in the case of a wholly innocent person, nervous and perhaps shocked at being confronted, isolated, interrogated and accused. Or perhaps

---

[1] The Inspectors claimed the knowledge that such agency was "linked to drug couriers."

[2] Perhaps the Defendant did not understand. Or maybe it *was* cheaper to get to the Dominican Republic one-way from Boston, *and* less expensive to obtain a round-trip airfare from Santo Domingo to Boston and back. The Court may even take judicial notice that the prices and means in the air travel industry are as fluctuable as the stock market.

[3] There is -- or shouldn't be -- no curiosity in a person visiting his kin while he or she was in his or her country of origin.

a physical, psychological, neurological or other medical condition

The Inspectors then asked the Defendant if he was smuggling drugs; the Defendant denied the interrogatory. Even so, the Inspectors presented the Defendant with an "x-ray consent form," which he signed.[4] *After* the "consent form" was executed, one of the Inspectors "noted" that the Defendant's stomach was "hard and distended." It would have been virtually impossible to arrive at such a conclusion unless the Defendant was subjected abdominal palpation at the hands of the Inspector.

Thence, the Defendant was taken to the Whidden Hospital in Everett where an x-ray of his torso was conducted, revealing the presence of foreign matter. He asked to use a rest room, where he passed a number of "pellets" which field tested positive for the presence of heroin. *At that point,* Customs Special Agent Kristin Rosenbeck placed the Defendant under arrest and administered the <u>Miranda</u> prophylaxes bilingually.

The rest follows naturally; he was kept in custody, made some incriminating statements, was charged and arraigned, and now brings this Motion to Suppress Evidence.

**Argument.**

---

[4] It should not go unnoticed that the Defendant was an alien, who – despite his resident status – kept close to those of his natural nationality and tongue. Consider his spelling of the word "Haverhill" in his Customs declaration. A United States born citizen, with English as a first and primary language, would be nervous and upset if faced with the Defendant's circumstances. , citi

3

This case looks like a hard sell, but not an impossible one.

The Defendant was detained on the premise of some sort of profile screen. He was then the object of an initial conversation, subjected to a secondary interrogation, a pat-down search and, finally, the equivalent of a "strip search" – an x-ray examination at an area hospital.

Although it is legally accepted that a person entering the country may be subject to an interview or to the inspection of his or her effects [see, for example, United States v. Asbury, 586 F.2d 973, 975-976 (2d Cir. 1978)], the authority of Customs Inspectors to so act is not wholesale, not without restraint. Beyond the initial encounter with the Inspectors, the Defendant asserts that his status was custodial, and that the ensuing events were constitutionally offensive.

"Profiling" is an insufficient basis upon which to found a belief that a subject was engaged in the commerce of contraband. Reid v. Georgia, 448 U.S. 438, 441, 100 S.Ct. 2752 (1980). It is the *profiling*[5] by the Customs Inspectors which initiated the confrontation with the Defendant and the domino events succeeding it. Rather than rely on a policy or profiling guideline to start the ball rolling, the Inspectors – from the Government's point of view – would have been better off without relying upon such a basis to begin questioning the Defendant. By using guidelines,[6] the Government chose a particular manner in which to proceed, and hence, perhaps unwittingly, chose the legal methodology by which their actions would later be gauged.   See also United States v. Berryman, 717 F.2d 651, 656 (1983), citing Reid, *supra* (emphasis added):

> ...the profile is simply a collage of otherwise innocent
> characteristics designed to guide the focus of the agents'

---

[5]   The "Passenger Analysis Unit."

[6]   Unknown to the Defendant.

4

>observations, and *only when the characteristics are combined in a suspicious manner, or lead the agents to observe independently suspicious conduct, is official intrusion warranted.*

In the Defendant's case, the "profile" characteristics are few and fall below what may be acceptable intrusion based upon such a screening mechanism. And many of the aspects of the "profile" are in this matter conspicuous in their absence. The Defendant did not, for example, use an alias, either in connection with his tickets or his initial questioning. His physical appearance was not bulky in awkward places, suggesting contraband secreted beneath his clothing. His reasons for travelling to his *home country* were entirely legitimate. He did not appear "nervous" prior to his interrogation. His pre-interrogation conduct at Logan was suggestive of no more than an everyday airline passenger. He gave a legitimate United States address in Haverhill, Massachusetts, albeit he may have misspelled the name of the Town. In short, for reasons not evident, the Inspectors decided to detain him.

There are better examples – fact-distinguishable from the instant matter – in which profiling was supported by at least some measure of suspicion beyond an assembly of otherwise innocent factors.

In <u>United States</u> v. <u>Braks</u>, 842 F.2d 509 (1st Cir. 1988), a secondary Customs search revealed that the defendant had secreted contraband – heroin – under her girdle. Customs was forewarned that the defendant would be making a crossing in possession of drugs. Also, the defendant presented oddly -- there was something unnatural about the contours of her belly which justified the further intrusion of a pat-down search. The <u>Braks</u> Court did observe, however, that for the Government to conduct a "strip search," it must be possessed of "reasonable grounds" and so demonstrate to a Court in order for such an intrusion to be upheld.

In <u>United States</u> v. <u>Montoya de Hernandez</u>, the combination of a routine examination of the defendant's passport, initial questioning and the contents of her valise

5

justified her detention.

In United States v. Rivera, 247 F.Supp. 2d 108 (D. P.R. 2003), Customs Agents conducted a surveillance of a vehicle which had made a border crossing, observed suspicious behavior and, before intervening in the defendants' affairs, acquired information which provided much substance to those suspicions.

The defendant in United States v. John Doe aka: Geronimo Pizarro Calderon, 829 F.Supp. 2d 511 (D. P.R. 1993) was carrying a small travel bag through the screening machine[7] at the passenger entry point of the Isla Verde International Airport in Puerto Rice. This was a fair ground for a further intrusion, that is, beyond the x-ray image itself.

In United States v. Pratt, 645 F.2d 89 (1st Cir.1981), the defendant arrived at an airport in Chicago, wearing bulky clothes, having paid for his ticket in cash, and had travelled from a "source" country. This was enough, the Court held, to subject him to a secondary inquiry, consisting of a questioning, a pat-down search and an examination of his effects. *He was permitted to be on about his way*.[8]

The present Defendant assigns that his presenting data and features did not warrant a secondary inspection and certainly did not warrant what amounted to a pat-down and a bodily intrusion. He also says that he was in "custody" prior to his execution of the x-ray "consent" form.

"The line between routine Customs questioning and custodial interrogation is not easily drawn... ." United States v. Ventura, 85 F.3d 708, 711 (1st Cir. 1996). The Ventura Court suggests that Customs Inspectors do not have an unlimited charter to inquire of a subject, detain him or her, make further inquiry and take more drastic actions

---

[7] Silhouettes of objects shown through a carrying device are also "profiled" for suspicious configuration or appearance. *Id.*, at 829 F.Supp. 2d 516 (D. P.R. 1993).

[8] It was only later, after the defendant had arrived at Boston, that he was placed under arrest while in the company of one Suzanne Weiner. In the interim, law enforcement Officers learned that he was a suspected drug smuggler, and had travelled to Thailand with Weiner, and that Weiner had been discovered with heroin in her suitcase upon her arrival in the United States from Thailand. Apparently, the authorities also came to know that the defendant had offered Weiner a sizeable amount of money to courier the drugs.

such as a strip search or a body cavity search.  While acknowledging that secondary Customs inspections do not *per se* constitute custodial questioning,[9] and that in "secondary inspections" any person might feel suspected of a crime, the Ventura Court admits of the real possibility of a custodial interrogation situation in a secondary inspection.  At 85 F.3d 711, the Court stated that

> In order to assess the 'restraint on freedom of movement,' a court must examine all the circumstances surrounding the interrogation.  The test is objective: the only relevant inquiry is 'how a reasonable man in the suspect's shoes would have understood his situation.' n2 Stansbury, 114 S.Ct. at 1529 (quoting Berhemer v. McCarty, 468 U.S. 420, 442 (1984)).
>
> Relevant circumstances include 'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'  United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987) (quoting United States v. Streifel, 781 F.2d 953, 961 n. 13 (1st Cir. 1986)).

The Court in United States v. Fernandez-Ventura, 132 F.3d 844 (1st Cir. 1998) suggests, but does not state flat-out, that a secondary customs inspection may constitute a custodial interrogation, subject to the mandatory advisories under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).  On its facts, however, the Court in United States v. MacNeil, 2000 U.S. LEXIS 7577, *10, *11 (D.C. Maine 2000) states directly that "...the line between custodial interrogation and routine customs' inquiry was crossed.  Those statements should be suppressed as being obtained in violation of *Miranda*."

At the time the Defendant in the present matter signed a "consent form" that an x-ray procedure be performed, it was clear that the Inspectors had no intention of advising

---

[9]  *Custodial* questioning, of course, requires that a subject be advised of his or her rights, and the consequences of waiving those rights.

him that he could go free or actually permitting him to do so. The Defendant's "consent" comes under question.

The Defendant urges the Court to bear in mind that although he may have been a resident alien, he could not be said to have assimilated because he kept company principally with persons with origins in the Dominican Republic. He was not accustomed to being interrogated, particularly in a language he probably neither spoke nor understood very well. He certainly had no idea – not having been informed thereof – of his lawful rights under the circumstances, exactly how far Customs Inspectors were permitted to go with an intrusion before it became constitutionally objectionable, or that he could have declined to sign any document allowing the equivalent of a body cavity search.

A search which is conducted by way of "consent" which is "...no more than acquiescence to a claim of lawful authority" [Bumper v. North Carolina, 391 U.S. 543, 548-549 (1968)] is not a valid search. See also Florida v. Riley, 488 U.S. 445, 109 S.Ct. 693 (1989). Where consent is claimed by the Government, special attention must be given to the vulnerability of the person involved. Schneckloth v. Bustamonte, 412 U.S. 218, 229, 93 S.Ct. 2041 (1973). Also,

> ...where the validity of a search rests on consent, the [Government] has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, *a burden that is not satisfied by showing a mere submission to a claim of lawful authority*. Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 329 (1979); Schneckloth v. Bustamonte, 412 U,S, 218, 233-234 (1973); Bumper v. North Carolina, 391 U.S. 543, 548-549 (1968); Johnson v. United States, 333 U.S. 10, 13 (1948); Amos v. United States, 255 U.S. 313, 317 (1921).

[Emphasis supplied.]

In this case, the Government cannot prove an unintimidated, free and voluntary consent to the body cavity search by x-ray or, for that matter, the palpation of the

Defendant by one of the Inspectors.

A body cavity search is a non-routine search -- even if conducted by Customs people, and it requires as a precursor "reasonable suspicion." United States v. Robles, 45 F.3d 1 (1st Cir. 1995). "Reasonable suspicion" invokes the Fourth Amendment. Huguez v. United States, 406 F.2d 366 (9th Cir. 1968). "The reasonable suspicion standard requires a showing of *articulable facts* which are particularized as to the person and as to the place that is to be searched." United States v. Henao-Castano, 729 F.2d 1364, 1366 (11th Cir. 1984). Legitimate "articulable facts" in this case simply did not exist.

The fruits of a search made while a person is in non-lawful custody must be suppressed. Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319 (1987). Likewise, any statement made by a person in custody without benefit of the Miranda prophylaxes must be excluded. And, of course, any evidence taken subsequent to the initial taint must also be excluded. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407 (1963).

For the reasons assigned herein, for such reasons as may be adduced at hearing on the Defendant's Motion, and for any other reason this Court may find to be in the interests of justice and fair play, the Defendant asks the Court to order that any and all evidence, directly or indirectly acquired by the Government after the time the Inspectors directed him to sign a consent form, be excluded in this or any other proceeding against him.

        Respectfully submitted,
        ARCENIO POCHE-CHACON,
        By his Counsel:


        '/s/Walter H. Underhill, Esquire'

                                            Walter H. Underhill, Esq.
                                            66 Long Wharf
                                            Boston, MA
                                            02110
                                            4th. Floor
                                            Tel. # 617-523-5858
                                            B.B.O. # 506300
                                            Tel.#:(617) 523-5858

DATED: August 8, 2005