UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| V. ) | |
| ANDRES DEL ROSARIO ALAYON, ) | CR NO. 05- 10039-NG |
| A.K.A ANGEL FIGUEROA A.K.A. ) | |
| ARCENIO POCHE CHACON, ) | |
| DEFENDANT. ) | |

### GOVERNMENT'S MEMORANDUM IN
### OPPOSITION TO DEL ROSARIO'S MOTION TO SUPPRESS

The United States of America, by Assistant U.S. Attorney Nancy Rue, hereby files this opposition to Defendant Andres Del Rosario Alayon, a.k.a Angel Figueroa a.k.a. Arcenio Poche Chacon's motion to suppress evidence and statements. As set forth more fully below, the motion should be denied without an evidentiary hearing because the defendant has failed to meet his burden of presenting the Court with specific, definite, and non-conclusory facts and a memorandum of reasons demonstrating why he is entitled to the remedy he seeks, in violation of Local Rule 7.1(B)(1) and relevant case law. Additionally, the motion should be denied on its merits because the law enforcement activities with respect to Del Rosario Alayon were a proper exercise of border authority under clear Supreme Court and First Circuit law.

**I.   Facts**

The defendant has not submitted an affidavit or other evidence contesting the facts as set forth in the affidavit of Special Agent Peter Darling, and the subsequent testimony of Special Agent Darling at the detention hearing in this matter on February 11, 2005.[1] At the hearing,

---

[1] The government has requested that the tape of the hearing be transcribed for the Court's convenience, but that tape is not yet available. The testimony is referred to herein simply as [Hearing Transcript]. The testimony in the Affidavit of Special Agent Peter Darling which was attached to the Complaint is referred to as "Complaint," with paragraph citation.

Special Agent Darling testified to one error which ran throughout his Complaint Affidavit: at the time that the Complaint was issued, the defendant's fingerprints had not yet been checked, and he was therefore identified in the Complaint by the name in his travel documents: Arcenio Poche Chacon. His true identity was learned through the information that came back from the fingerprint check: the fingerprints matched Andres Del Rosario Alayon (as well as a fugitive from a New York drug conviction under the name of Angel Figueroa). [Hearing Transcript]. Agents pulled the immigration files for Poche Chacon and Del Rosario Alayon.[2] The file for Poche Chacon showed that the real person by that name is missing two fingers. <u>See</u> attached exhibit A (identified as Exhibit 4 at the hearing). The file for Del Rosario Alayon included a fingerprint card that matched the defendant herein. An immigration file existed on this person based on a prior illegal entry, in which he had used the identity of Arcenio Poche Chacon. <u>See</u> attached exhibit B (identified as Exhibit 3 at the hearing). <u>See also</u> Hearing Transcript. In short, the defendant, whose true identity is Andres del Rosario Alayon, entered the country while falsely claiming to be Arcenio Poche-Chacon.

Given the lack of affidavit from Defendant, the following facts previously introduced into evidence in this matter must be accepted as true for purposes of this motion:

1. On January 31, 2005, Andres del Rosario Alayon arrived at Boston Logan Airport from Santo Domingo, Dominican Republic, onboard American Airlines (AA) flight 2084, traveling under the name Arcenio Poche-Chacon. [Hearing]
2. Because del Rosario was traveling under the name of Arcenio Poche-Chacon, all decisions made by Customs and Border Protection and/or Immigration and Customs Enforcement regarding defendant's entry into the United States were made based on the travel records in the name "Poche-Chacon." Customs Inspectors noted that, based on his travel documents, defendant was a resident alien,[3] but had extensive short trips

---

[2] No file existed under the name Angel Figueroa.

[3] This, of course, was subsequently learned to be false. Andres Del Rosario Alayon is not in fact a resident alien. He is believed to be a citizen of the Dominican Republic who illegally

2

to the U.S. with extended periods of time outside the U.S. Inspectors noted that defendant had purchased his plane ticket through a travel agency in the Dominican Republic known to Inspectors as linked to drug couriers. Complaint at ¶ 4.

3. Customs and Border Patrol [CBP] Inspectors conducted the secondary inspection in Spanish. Complaint at ¶ 5. During the inspection, defendant stated to Inspectors that he departed Boston for the Dominican Republic on or about January 2, 2005 to visit a sick nephew. Defendant listed his U.S. address as "30 Hervoll, Hervoll, MA" on his Customs declaration. Defendant stated that he lived with his sister-in-law and her husband at 30 Victor Street, Haverhill, MA. Defendant stated that he was currently unemployed and last worked in November 2004 at a convenience store in Haverhill, MA. Id.

4. Defendant stated that he purchased a one-way ticket from Boston to the Dominican Republic. Defendant stated that a one-way ticket was cheaper than a round-trip ticket. Defendant stated that he then purchased a round-trip ticket in the Dominican Republic to return to Boston because it was cheaper than a one-way ticket. Inspectors questioned Defendant regarding why he did not initially purchase a round-trip ticket to which he replied a one-way ticket was cheaper. Defendant was unable to explain the apparent discrepancy in his story. Defendant indicated that he did not intend to use the return portion of his ticket that listed a return back to the Dominican Republic on February 5, 2005. Defendant claimed that he paid for his own ticket. Complaint at ¶ 6.

5. During the interview, inspectors noted signs that Defendant was an internal carrier of narcotics, including dry mouth, lethargy and rigid stance. Specifically, inspectors noted that Defendant frequently attempted to swallow; that he was lethargic and sleepy; and that he remained seated in the same position, leaned back with his legs slightly open, with no fidgeting or shifting to adjust his stance. Based on inspectors and agents' training and experience, these are physical indicators of an internal carrier.

6. Inspectors asked Defendant if he was smuggling drugs. Defendant repeatedly stated that he had nothing and lifted his shirt up to expose his stomach. Inspectors asked Defendant whether he would agree to be X-rayed, and presented Defendant with an X-Ray consent form, which he signed. The consent form was written in Spanish and is attached hereto as Exhibit C (introduced at the hearing as Exhibit 11).

7. Prior to transport to Whidden Hospital for an X-ray examination, Inspectors performed a patdown of Defendant. Inspectors noted that Defendant's stomach was hard and extended, which is indicative of an internal drug courier.

---

entered the United States, appropriated the identity of Arcenio Poche-Chacon, a lawful resident alien residing in Puerto Rico.

## II. ARGUMENT

**A. Defendant Has Not Met His Burden to Allege Specific Facts for His Motion.**

Local Rule 7.1(B)(1) states that a party filing a motion "shall at the same time file a memorandum of reasons, including citation of supporting authorities, why the motion should be granted." The rule also states that "[a]ffidavits and other documents setting forth or evidencing facts on which the motion is based shall be filed with the motion." The mandatory language of Local Rule 7.1 coincides with the threshold burden imposed by First Circuit case law for obtaining an evidentiary hearing on a motion to suppress.

In United States v. Migely, 596 F.2d 511 (1st Cir. 1979), the Court affirmed the district court's denial of the defendant's motion to suppress evidence without conducting an evidentiary hearing. In so doing, the Court set forth the threshold burden that a defendant must meet in order to obtain an evidentiary hearing on a motion to suppress:

> Evidentiary hearings on motions under Fed.R.Crim.P. 41(e) are not granted as a matter of course; they are required only when a defendant makes a sufficient showing that a warrantless search has occurred. The defendant must allege facts, "sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." The factual allegations must be such that, if proved, would require the grant of relief, and must be more than "general and conclusory or based upon suspicion and conjecture."

Id. at 513 (citations omitted).

In United States v. Panitz, 907 F.2d 1267 (1st Cir. 1990), the Court affirmed the district court's denial of the defendant's motion to dismiss for alleged outrageous government misconduct without conducting an evidentiary hearing. In so doing, the Court held that "a criminal defendant has no absolute or presumptive right to insist that the district court take testimony on every motion." Id. at 1273. Rather, it ruled, "[t]he test for granting an evidentiary hearing in a criminal case should be substantive: did the defendant make a sufficient threshold

4

showing that material facts were in doubt or dispute?" Id.  The Court further held that the district court acted within its discretion in rejecting the requested evidentiary hearing because the material facts were not in dispute.  Id. at 1274.

The legal principles enunciated in Migely and Panitz have been reaffirmed in subsequent opinions.  United States v. Staula, 80 F.3d 596, 603-04 (1st Cir. 1996)(explaining that an evidentiary hearing on a motion to suppress is required "only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record" and "[m]ost importantly, . . . that there are factual disputes which, if resolved in [defendant's] favor, would entitle him to the requested relief."); United States v. Calderon, 77 F.3d 6, 9 (1st Cir. 1996)(affirming district court's denial of motion to suppress fruits of warrantless search of apartment without conducting evidentiary hearing where defendant filed no affidavits in support of the motion); United States v. Lewis, 40 F.3d 1325, 1332 (1st Cir. 1994)(affirming district court's refusal to hold evidentiary hearing on defendants' motion to suppress evidence where defendants failed to file any affidavits containing specific facts in support of their motion); United States v. Levasseur, 704 F.Supp. 1158, 1166-70 (D. Mass. 1989)(Young, DJ)(denying motion to suppress evidence without conducting evidentiary hearing where "defendants make no allegations at all and merely call on the government to justify its seizure at an evidentiary hearing," the Court observing that "[i]f facts are in dispute, an affidavit is the appropriate vehicle by which to apprise the Court.").

Accordingly, because defendant Del Rosario has failed to file an affidavit alleging specific facts in support of his motion, his motion should be denied without a hearing.

**B.     The X-Ray was Lawful**

    1.     <u>Del Rosario Consented to the X-Ray</u>

Del Rosario consented to the x-ray of his abdomen. Exhibit C. <u>See also</u> Complaint at ¶ 8; Hearing Transcript. There is no dispute about this. Defendant implies, via footnote, that defendant may have been confused by the proceedings, noting that "a United States born citizen, with English as a first and primary language, would be nervous and upset . . . ." Motion, note 4. Defendant argues that "He was not accustomed to being interrogated, particularly in a language he probably neither spoke nor understood very well." Motion at page 7. However, the undisputed testimony is that the entire interview took place in Spanish. <u>See</u> Complaint at ¶ 5. Likewise, the form that was presented to the defendant was written in Spanish. <u>See</u> Exhibit C. Accordingly, there is no basis in the record for questioning the voluntariness of defendant's consent to the x-ray.

Defendant argues that the questioning was custodial. Motion at page 7. There is no basis in the record for that conclusion. Defendant submits no affidavit contesting the facts set forth in the Complaint and at the hearing. There is simply no basis other than defendant's innuendo for asserting that the questioning was custodial. <u>See</u> <u>United States v. Montoya de Hernandez</u>, 473 U.S. 531, 536 (1985) (detention of suspected alimentary canal smuggler for nearly 16 hours before seeking warrant was not unreasonable); <u>United States v. Fernandez-Ventura</u>, 132 F.3d 844 (1st Cir. 1998) (interrogation of person who had previously cleared customs by four officers, two of whom were armed, did not convert routine customs secondary inspection into an arrest).

    2. <u>Even Without Considering Consent, Reasonable Suspicion Was Present</u>.

As noted above, there is no basis in the record for questioning the validity of the x-ray consent. However, even if Del Rosario had not consented, the patdown and x-ray were an appropriate exercise of border authority.

6

In United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985), the Supreme Court addressed the level of suspicion required to detain an airline passenger suspected of being an internal narcotics courier. In that case, a female passenger who was suspected of being an internal courier (or "balloon swallower," id. at 534), had agreed to be x-rayed but withdrew her consent because she did not wish to be handcuffed in transport to the hospital. Id. Instead, she was eventually involuntarily subjected to a court-ordered rectal examination. Id. at 535-36. The Supreme Court determined that the involuntary rectal examination was appropriate, and set forth the standards for detention of persons at the border. "Routine searches of the persons and effects of entrants [at the international border] are not subject to any requirement of reasonable suspicion, probable cause, or warrant." United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985). Detention of a traveler beyond the scope of a routine search is justified "if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." Id. at 541.

The First Circuit expanded on this standard in United States v. Uricoechea-Casallas, 946 F.2d 162 (1st Cir. 1991):

> [P]robable cause is not required to conduct routine border inspections or customs searches. This Court has adopted the "no suspicion" and "reasonable suspicion" standards for reviewing such searches. Under the "no suspicion" standard applicable to routine border searches, a customs officer may search an individual based on "subjective suspicion alone, or even on random basis." Where a search is not routine (e.g. a strip search), we have applied the reasonable suspicion standard. United States v. Wardlaw, 576 F.2d 932 (1st Cir. 1978). Under this standard, a border search of an individual's person is lawful if the government can "demonstrate some objective, articulable facts that justify the intrusion as to the particular person and place searched." Braks, 842 F.2d at 513 (citing United States v. Afanador, 567 F.2d 1325, 1328 (5th Cir. 1978)).

946 F.2d at 166.

A patdown search falls within the category of routine searches that are not subject to any

7

requirement of reasonable suspicion.  See United States v. Braks, 842, F.2d 509, 513 (1st Cir. 1988)("Pat-down searches have also been held to be routine."); U.S. v. Forde, 30 F.3d 127 1994 WL 390143 (1st Cir. Jun 30, 1994) (Unpublished No. 93-1322)("Under the 'no suspicion' standard applicable to routine border searches, a customs officer may search an individual based on "subjective suspicion alone, or even on random basis."  The patdown search of Forde, including the request that he remove his shoes constituted a routine border search.") (internal citations omitted).

Therefore, by the time that Del Rosario was x-rayed, the CBP officials had the following information:

- he was a frequent traveler to a source country for drugs;
- despite claiming to live in the US, he had traveled to the Dominican Republic using a one way ticket;
- despite claiming to live in the United States, his ticket "back home" to Boston was a round-trip ticket;
- he claimed that he initially bought the one way ticket because a one way was cheaper, but then claimed to have bought a roundtrip ticket because he claimed that was cheaper;
- he paid for these tickets himself despite being unemployed since November 2004;
- he was unable to spell the city where he claimed he lived and had previously worked;
- he manifested physical symptoms of an internal courier, including dry mouth, lethargy and rigidity of stance; and,
- his stomach was hard and distended, a physical indicator of an internal courier.

While an x-ray likely falls within the category of "nonroutine" searches, based on these facts, the CBP officials clearly had reasonable suspicion that Defendant was an internal courier of narcotics sufficient to justify an x-ray of his abdomen.  In Montoya de Hernandez, the Supreme Court expressly declined to determine what standard applied to "nonroutine body searches such as strip, body cavity, or involuntary x-ray searches."  Id. at 541 n.4.  The First

8

Circuit has noted that the only type of search which has been consistently held to be non-routine is a strip-search or body cavity search.  United States v. Braks, 842 F.2d 509, 511-13 (1st Cir. 1988).  Nonetheless, in a 1988 case involving a search in which a female airline passenger was ordered to lift her clothing, the First Circuit surveyed the law applicable to border searches post-Montoya de Hernandez, and adopted a flexible standard for determining the degree of suspicion which is necessary to justify a search, depending on the degree of invasiveness.  See Braks, 842 F.2d at 511-13.  The First Circuit noted the following factors are relevant in that review:

> (i) whether the search results in the exposure of intimate body parts or requires the suspect to disrobe;
>
> (ii) whether physical contact between Customs officials and the suspect occurs during the search;
>
> (iii) whether force is used to effect the search;
>
> (iv) whether the type of search exposes the suspect to pain or danger;
>
> (v) the overall manner in which the search is conducted; and
>
> (vi) whether the suspect's reasonable expectations of privacy, if any, are abrogated by the search.

Id.

Applying these factors to the Del Rosario x-ray, the x-ray was lawful.  In del Rosario's circumstances, officers had reasonable suspicion that he was an internal courier.  Del Rosario claimed to live in the United States, but was traveling on a roundtrip ticket originating in the Dominican Republic, claimed to be unemployed but traveled internationally frequently, gave inconsistent answers to why he had purchased his ticket the way he had,  was a frequent traveler to a source country for drugs, was unable to spell the city where he claimed he lived and had previously worked,  manifested physical symptoms of an internal courier, including dry mouth, lethargy and rigidity of stance, and had a hard and distended stomach.  These are all signs that an experienced customs inspector would recognize as consistent with internal drug smuggling.

Therefore, the customs personnel had a high level of particularized suspicion that Del Rosario was an internal narcotics smuggler.

While the level of suspicion was significant, the level of intrusion was minimal. Agents had a right to simply leave del Rosario in a room for whatever time was required to have a monitored bowel movement into a garbage can. Montoya de Hernandez, 473 U.S. at 543-44. While such detention would undoubtedly be "long, uncomfortable, indeed, humiliating," id. at 544, and would ultimately "result in the exposure of intimate body parts," Braks, 842 F.2d at 512, to accomplish, it was fully within their power. See Montoya, 473 U.S. at 543-44. Instead, the agents took del Rosario to a hospital, where, while clothed, he was subject to a standard medical procedure, performed by medical personnel, that did not require physical contact or invasion of intimate body parts. See also United States v. Vega-Barvo, 729 F.2d 1341, 1346-48 (11th Cir. 1984) (noting that x-ray does not subject individual to the indignity of the rectal probe at issue in Montoya, and therefore the level of suspicion required to perform them is low); United States v. Pino, 729 F.2d 1357 (11th Cir. 1984) (noting that x-rays can be performed with a lower level of suspicion than a rectal exam). Therefore, balancing the intrusion against the invasion, the x-ray of del Rosario was lawful, whether or not it was voluntary, and the evidence should not be suppressed.

### C. Even if the X-Ray were Unlawful, the Rule of Inevitable Discovery Applies.

Even if the Court were to determine that the x-ray was involuntary, the results would be admissible under the rule of inevitable discovery. See United States v. Scott, 270 F.3d 30, 43-45 (1st Cir. 2001). Under Montoya de Hernandez, 473 U.S. at 543-44, it is clear that if a passenger suspected of internal smuggling cannot or will not be x-rayed, the customs inspectors have the right to "detain [the passenger] for such time as necessary to confirm their suspicions" through a monitored bowel movement. Id. at 543. They have no obligation to turn the passenger "loose

into the interior carrying the reasonably suspected contraband drugs." Id. at 543.  See United States v. Pino, 729 F.2d 1357 (11th Cir. 1984) (noting that the choice to have an x-ray is a Hobson's choice, because "in the absence of consent, the agents can detain you until nature reveals the truth or falsity of their suspicions.")

                                                    Respectfully Submitted,

                                                    MICHAEL J. SULLIVAN
                                                    United States Attorney

By:    /s/Nancy Rue
        Nancy Rue
        Assistant U.S. Attorney